IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUTHER CASSELL, Jr., ) | |
| ) | Case No. 04 C 7707 |
| Plaintiff, ) | |
| ) | Judge Virginia M. Kendall |
| v. ) | |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Luther Cassell ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Disability Insurance Benefits and Supplemental Security Income under Sections 216(I), 223, 1611, and 1614 of the Social Security Act. 42 U.S.C. §§416(I), 423, 1381(a), and 1382(a). The parties have cross-moved for summary judgment based on the administrative record. Because the Court finds that expert medical testimony was necessary to provide the Administrative Law Judge ("ALJ") with the substantial evidence in the record required to make an informed decision as to whether Plaintiff was disabled, the ALJ's decision is vacated and the case is remanded for further proceedings.

**Statement of the Case**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income on March 10, 2003, alleging that he became unable to work on April 23, 2002 due to asthma. (R. 67-69, 74, 177). The Commissioner denied his claims initially and on reconsideration. (R. 29, 38). Plaintiff filed a timely request for a hearing on July 23, 2003 and the hearing was held on March 2,

2004, before an ALJ. (R. 42, 196). On March 24, 2004, the ALJ issued a decision denying Plaintiff's claims. (R. 17-26). The Appeals Council denied Plaintiff's request for review on September 24, 2004, making the ALJ's decision the final decision of the Commissioner. (R. 6-8).

**Plaintiff's Background**

Plaintiff was born on March 27, 1964 and was 39 years old at the time of the hearing. (R. 67). From 1994 to 1997, Plaintiff worked full time as a meat curer. (R. 70-71, 73, 75, 200). This job ended when the company moved, and Plaintiff drew unemployment and worked for cash without reporting earnings from 1998 to 2000. (R. 73, 201-02). In 2001 and 2002, Plaintiff worked for U.S. Filters unloading trucks until he was fired. (R. 71, 75, 203). After he was fired, he drew unemployment until February 2003. (R. 204). Plaintiff has not worked since April 23, 2002. (R. 75).

**Plaintiff's Medical History**

On March 5, 2003, Plaintiff sought treatment at the Cook County Hospital Emergency Room for his asthma. (R. 141). According to the doctor's notes, he complained of one day shortness of breath, but no wheezing and mild or no asthma exacerbation. (R. 141). Plaintiff also complained of a cough and intermittent emesis (vomiting) for two months. (R. 141). The doctor's notes record that Plaintiff was a smoker and used heroin and alcohol, but that he denied using cocaine or speed. (R. 141). In the physical exam section of the doctor's notes, it states that Plaintiff had no wheezing, retractions, diaphoresis, or anxiety. (R. 141). The hospital also performed an EKG and chest x-ray. (R. 142). The listed diagnoses were "volume depletion," "tachycardia resolved" and "gastritis resolved." (R. 142). Plaintiff was prescribed Albuterol, Sudafed and Zantac and given an appointment at the asthma clinic. (R. 142).

On March 12, 2003, Plaintiff was seen as a new patient in the asthma clinic. (R. 144). Plaintiff reported that he had "no problem or concern right now," but that he suffered from asthma for eight years and had been admitted to the hospital for it twice – once eighteen months earlier and once in 1995. (R. 145). The treating source described his asthma as "severe persistent." (R. 144). The physician prescribed Prednisone as well as Albuterol. (R. 144).

On March 17, 2003, Plaintiff took a pulmonary function test. (R. 174-76). The test included different measures – such as forced vital capacity and forced expiratory volume – used to assess Plaintiff's pulmonary function before and after his use of a bronchodilator.[1] (R. 174). The "Interpretation" field of the resulting Pulmonary Function Report is blank and the parties read the data in the report differently. (R. 175).

On March 31, 2003, Dr. Rana performed an internal medicine consultative examination of Plaintiff for purposes of this disability claim. (R. 147). Plaintiff told Dr. Rana that he had bronchial asthma for about nine years and he had last been hospitalized in 2001. (R.147). Plaintiff related that he had difficulty breathing, which became worse on change of weather, exposure to dust or smoke, and exertion. (R. 147). Plaintiff reported that an inhaler partially eased his shortness of breath. (R. 147). He reported that he had to go to the emergency room once a month for breathing treatments. (R. 147). He claimed that he could walk only one-half block before becoming tired and short of breath. (R.147). Plaintiff admitted to smoking a half-pack of cigarettes a day and denied drug abuse. (R.147). He reported that he was using a Flovent inhaler, Albuterol inhaler, Zantac, and Prednisone. (R.147). On exam, Plaintiff's lungs were "clear with bilateral fair air entry" and he had "no rales,

---

[1] Bronchodilators are a class of drugs designed to open the airways. Waiting on PDR from Kocoras' chambers.

rhonchi or wheezing." (R.148). Dr. Rana diagnosed bronchial asthma and noted that Plaintiff's lungs were clear to auscultation and percussion on that day. (R.149) During April 2003, Plaintiff was prescribed Prednisone tablets (R.165), Albuterol (R.167), Flonase spray (R. 169), and Diphenhydramine (R. 163).

In May 2003 and August 2003, two medical doctors reviewed Plaintiff's medical records for the state disability agency. (R. 152-59). While acknowledging that Plaintiff had a diagnosis of bronchial asthma and some discomfort as a result, their assessment stated that Plaintiff could perform the exertional requirements of light work. (R. 153). The assessment stated further that he should never climb ropes or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. (R. 154). It also indicated that Plaintiff should "avoid concentrated exposure" to fumes, odors, dusts, gases, poor ventilation and other respiratory irritants. (R. 156).

Plaintiff returned to the asthma clinic for follow up treatment on June 25, 2003. (R. 171). Since his last visit, he had had no ER visits and no hospitalization. (R. 171). In the previous two weeks, he reported that he did not have any nights with symptoms and did not have any days when he used more than the usual amount of Albuterol. (R. 171). The treating physician described his asthma as "severe persistent" and the activity as "unstable." (R. 171).

**Plaintiff's Disability Hearing**

Plaintiff testified at the hearing that his asthma interfered with his ability to work even when sitting and especially if it involved lifting heavy weight. (R. 205-07). He also testified that he experiences difficulty breathing in all conditions, and that his condition worsens with changes in the weather. (R. 207). When asked to describe how he feels when sick, Plaintiff stated that he has trouble breathing even when sitting or lying down, that he throws up, and that he has trouble

4

breathing every day. (R. 208). Plaintiff testified that he gets short of breath even after talking for awhile or after walking around in his house. (R. 209-10). Plaintiff testified that he does not sleep well due to his difficulty breathing. (R. 209-10). Plaintiff admitted that he still smokes cigarettes. (R. 209). Plaintiff provided varying responses for why he has not sought consistent medical treatment for his asthma. (R. 206, 208).

Dr. Mark Oberlander, a specialist in clinical psychology and hypnosis, testified next at Plaintiff's hearing. (R. 61, 213-18). Dr. Oberlander testified that the medical record did not show any evidence of mental impairments. (R. 213). The ALJ then briefly questioned Dr. Oberlander regarding the documented history of Plaintiff's treatment for asthma before dismissing him. (R. 214-16).

Last, a vocational expert, Susan Etenberg, testified that a person of Plaintiff's age, education, and work experience, who could lift twenty pounds occasionally and ten pounds frequently; who could occasionally stoop, kneel, crouch, crawl, and climb stairs; who could not climb ladders or scaffolding; and who should not work in any environment with concentrated exposure to respiratory irritants would not be able to perform Plaintiff's past work, but could perform any of the tens of thousands of jobs as a cashier, packer or assembler in the Chicago metropolitan area.

**Regulatory Framework and ALJ's Decision**

An ALJ must follow a five-step test to determine whether a claimant is disabled:

Step one excludes anyone employed in substantial gainful activity from eligibility for disability benefits. 20 C.F.R. §§ 404.1520(b), 416.920(b). Substantial gainful employment is defined as work which "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910.

5

Step two disqualifies claimants who do not have a "severe" impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). A severe impairment is one which significantly limits an individual's physical or mental ability to do "basic work activities" for a period that has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. §§ 404.1520(c), 416.920(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b).

Step three compares the impairments of the claimant to a listing of medical conditions which the Commissioner concedes are severe enough to prevent a person from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d) , 416.925(a). If the claimant's impairment equals or exceeds a listed impairment, the claimant conclusively is determined to be disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to establish equivalence to the listings, he must take the alternate route through steps 4 and 5 to prove disability.

Before proceeding to steps 4 and 5, the claimant's Residual Functional Capacity ("RFC") must be established. A claimant's RFC is used to assess what level of work (sedentary, light, medium, heavy or very heavy) the claimant is capable of performing despite his physical or mental limitations and in light of his age, education, and work experience. 20 C.F.R. §§ 404.1545(a), 416.945(a).

Step four uses a claimant's RFC to evaluate whether his impairment prevents the claimant from performing work that he has performed in the past. If the claimant can still perform the work, he is disqualified. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Step five examines whether the claimant is able to perform other work in the national economy based upon his RFC. The claimant is entitled to benefits only if he cannot perform other

work. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See* 20 CFR §§ 404.1520, 416.920 (outlining the five-step process); *Marcus v. Sullivan*, 926 F.2d 604, 606 (7th Cir. 1991). The claimant has the burden of proof during steps one through four, but at step five the burden shifts to the Commissioner. *See Pope v. Shalala*, 997 F.2d 473, 477 (7th Cir. 1993).

Following this sequential test, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 20-26). At step one, the ALJ found that there was no evidence of Plaintiff working after the alleged onset of his disability. (R. 21). Plaintiff then survived elimination at step two based on the ALJ's finding that his "medically determinable" conditions could be classified as severe. (R. 21). Proceeding forward, Plaintiff conceded at step three that his condition did not meet any of the impairment Listings.[2] Accordingly, the ALJ next determined Plaintiff's RFC in order to evaluate Plaintiff's ability to perform his past work or other work in the economy. In making that determination, the ALJ concluded that the record as a whole, and in particular the objective medical evidence, did not support Plaintiff's allegations of disabling symptoms[3] and functional limitations. (R. 22, 25). Rather, the ALJ found Plaintiff capable of performing a limited range of light work with limitations to only occasional climbing of stairs, crouching, crawling, stooping, kneeling, and bending, and restrictions from working in an environment with exposure to respiratory irritants in concentrated levels. (R. 21-22, 24-25). Based on these limitations, the vocational expert testified that Plaintiff could not do the work that he

---

[2] The claimant's asthma had not resulted in attacks occurring, despite prescribed treatment, as frequently as required by section 3.03, nor did the record reflect any pulmonary function studies with results equivalent to that required under the tables associated with section 3.02. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 3.02, 3.03.

[3] SSR 96-7p defines a symptom as "an individual's own description of his or her physical or mental impairment(s)."

7

performed in the past, but was capable of performing work as a cashier, packager, or assembler. (R. 24-25). Given his ability to perform these jobs, the ALJ concluded that Plaintiff was not "under a disability for purposes of Titles II and XVI of the Social Security Act." (R. 24).

**ANALYSIS**

This Court will affirm the Commissioner's denial of disability benefits when the decision is supported by substantial evidence in the record. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The Court will review the entire administrative record in making the substantial evidence determination, but will not reweigh evidence, decide questions of credibility or resolve conflicts in the evidence. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

**The Medical Expert Testimony Did Not Provide an Informed Basis for Determining Whether the Claimant Was Disabled**

The SSA's regulations provide that, in examining the evidence in the record, the ALJ may ask for and consider opinions from medical experts on the nature and severity of the claimant's impairment, whether the impairment equals the requirements for a listed impairment, or whether the impairment could reasonably be expected to produce the claimant's symptoms. *See* 20 C.F.R. §§ 404.1527(f)(2)(iii), 404.1529(b). As the regulations use the word "may," there is no universal requirement that an ALJ call a medical expert at the hearing. *See Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999). However, the procedure for adjudicating a social security disability claim differs from the traditional adversarial model such that an expert must be called "if that is necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204

F.3d 780, 781 (7th Cir. 2000); *see Sims v. Apfel*, 530 U.S. 103, 110-11 (2003) ("It is the ALJ's duty to investigate the facts and develop the arguments for and against granting benefits").

The ALJ designated Dr. Mark Oberlander, Ph. D., a specialist in clinical psychology and hypnosis, to testify at Plaintiff's hearing. (R. 61). The Hearing and Appeals Manual (HALLEX) states that "[t]he ALJ or designee must select the ME whose expertise is most appropriate to the claimant's diagnosed impairment(s)." HALLEX I-2-5-36. The Commissioner concedes that Dr. Oberlander's speciality was not "most appropriate" to Plaintiff's asthma, but postulates, perhaps correctly, that the ALJ called Dr. Oberlander because a potential disability existed based on Plaintiff's past drug use. Plaintiff counters that given Dr. Oberlander's lack of knowledge regarding his asthma impairment, the ALJ's reliance on this expert testimony was improper and prejudicial.

When counsel for Plaintiff objected at the hearing, the ALJ explained "Social Security views its medical experts as medical experts, and they are qualified by their training to speak to – training not only professionally but also training as medical experts in this program to speak about medically determinable impairments that are not limited to their area of expertise." (R. 214). The proper scope of a medical expert's testimony is addressed in the SSA's Hearing and Appeals Manual, "[a]n ALJ must not question an ME about any matter which is not within the ME's area of expertise and responsibility." HALLEX I-2-5-39. The Commissioner argues that this admonition is limited to the context of its example that "the ALJ must not ask an ME about vocational matters, or how the ALJ should decide the case." HALLEX I-2-5-39. The Court disagrees with the Commissioner's reading,[4] but because the ALJ did not actually ask Dr. Oberlander any questions that required analysis or

---

[4] The example relates to the "responsibility" half of the conjunction, on the other side though, the "area of expertise" language should be read logically to limit questions to those within the expert's professional or medical area of expertise as well.

expertise regarding Plaintiff's asthma condition, the argument is academic. Dr. Oberlander's testimony was limited to an assessment of Plaintiff's potential mental impairments, his area of expertise, and a simple recitation of the medical evidence already in the record. And given that Plaintiff cannot show that Dr. Oberlander in any way misrepresented the medical record, no prejudice resulted.

Equally true, however, is that Dr. Oberlander's testimony cannot constitute substantial evidence in support, or an informed basis for, the ALJ's decision. *See Maciejewski v. Apfel*, 2000 WL 1788437, *8 (N.D. Ill. 2000) (noting the ALJ's duty to develop the record and holding that testimony from a medical expert lacking expertise in the relevant medical area is not substantial evidence). As such, any error the ALJ committed in calling Dr. Oberlander as a medical expert lies in the fact that Dr. Oberlander's testimony could not provide an informed basis for the ALJ's disability determination, not that the testimony prejudiced his decision. If the record otherwise contains substantial evidence on which the ALJ could make an informed determination of Plaintiff's disability, such an error would be harmless. *See Keys v. Barnhart*, 347 F.3d 990, 995-96 (7th Cir. 2003) (stating that harmless error doctrine applies to review of SSA decisions).

**Expert Testimony Was Necessary to Provide an Informed Basis for Determining Whether the Claimant Is Disabled**

It is the ALJ's responsibility to develop a complete record, including summoning a medical expert to testify when necessary. *Green*, 204 F.3d at 781. The ALJ may not draw inferences or render his own opinions on questions requiring medical expertise. The "inquisitorial" nature of Social Security adjudication process demands that the ALJ instead contact medical sources to obtain additional evidence or call a medical expert to testify if necessary to adjudicate a disability claim.

*See Sims*, 530 U.S. at 110; 20 C.F.R. §§ 404.1512(e); 404.1527(f)(2)(iii). Here, the ALJ erred both in basing certain disability findings on his own interpretation of the medical evidence and in failing to develop other evidence in the record through medical expert testimony so that he could make an informed determination of Plaintiff's disability.

The ALJ lacked an informed basis to conclude that Plaintiff's treatment was either "conservative" or "ha[d] been generally successful in controlling the symptoms." (R. 23). The finding that Plaintiff was receiving "conservative treatment" is the ALJ's own view and description of the treatment, not language taken from the record or the testimony of a medical expert. *See Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) (remanding when ALJ concluded that a good prognosis for speech and language difficulties was inconsistent with a diagnosis of mental retardation). Likewise, the record does not contain any medical professional's opinion that the treatment successfully had controlled Plaintiff's symptoms. In the end, the ALJ's opinions regarding Plaintiff's treatment history and its success were his own. Because the opinions addressed questions of the type requiring medical rather than legal acumen, they should have been made by a medical expert. *See Schmidt*, 914 F.2d at 118 ("The medical expertise of the Social Security Administrative is reflected in regulations; it is not the birthright of the lawyers who apply them.").

At his last hospital visit, the treating physician diagnosed Plaintiff with severe, persistent asthma and noted that the asthma was unstable. (R. 171); *see also* (R. 144) (containing different physician's earlier diagnosis of asthma as severe, persistent). Severe, persistent asthma is the most serious classification of asthma. *See* U.S. Department of Health and Human Services and Centers for Disease Control and Prevention, Key Clinical Activities for Quality Asthma Care: Recommendations of the National Asthma Education and Prevention Program (Oct. 2003) at 4

11

("CDC Report"). And unstable activity indicates that the asthma is not controlled. *See* CDC Report at 4; http://www.asthmaassistant.com/glossary.html. The ALJ did not explain how his negative credibility findings regarding Plaintiff's symptoms and disability could be reconciled with a diagnosis of severe, persistent and unstable asthma. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record"). The Court is not implying that the symptoms of severe, persistent asthma cannot be controlled through conservative treatment so that Plaintiff could work, or that the two treating physicians' diagnoses even were correct. The problem is that the Court has no basis from the record for knowing the answers to these questions, which is exactly why an expert medical opinion on these matters is necessary. *See Schmidt*, 914 F.2d at 118 ("Common sense can mislead; lay intuitions are often wrong.")

A medical expert also was needed to interpret Plaintiff's results on his pulmonary function test. (R. 175). *See* HALLEX I-2-5-34 ("ALJ must obtain an ME's opinion . . . to evaluate and interpret background medical test data."). The pulmonary function test is a key tool in initially classifying the severity of asthma. *See* CDC Report at 4. The parties read differently Plaintiff's test results and, more important, no doctor ever interpreted those results. (R. 175). For his part, the ALJ did not even mention the test in his decision. Besides just translating the raw numbers, it seems essential to have an opinion on the significance of Plaintiff's results and their congruence, or lack thereof, with Plaintiff's symptoms -again, work suited to a medical expert rather than a layman.

Finally, the ALJ's negative findings regarding Plaintiff's limitations on his daily activities would have been benefitted from a more complete analysis by a medical expert familiar with asthma, its symptoms and potential functional limitations. *See Rohan v. Chater*, 98 F.3d 966, 970-71 (7th

12

Cir. 1996) (ALJs may not make independent medical findings regarding whether certain activities are inconsistent with a particular medical diagnosis). That is not to say that the Physical Residual Functional Capacity Assessment, prepared in connection with Plaintiff's state disability claim, did provide basis for the ALJ's disability determination. The report concluded that "[a]lthough the clmt may experience some pain and discomfort he is still able to do light work." (R. 159). The section of the assessment which requests an opinion on the severity of Plaintiff's symptoms in relation to the medical evidence and non-medical evidence – including his daily activities and behavior – is blank, however. (R. 157). Absent any underlying explanation of Plaintiff's treatment, tests or diagnoses, the boxes checked regarding Plaintiff's limitations and the conclusion that Plaintiff is able to do light work are much less substantial. *See also Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (stating that opinions from non-treating physicians are afforded limited weight); *Gudgel*, 345 F.3d at 470 (holding that a negative opinion of a non-examining physician is not, by itself, substantial evidence).

## Conclusion

It was the ALJ's duty to develop substantial evidence in the record such that he could make an informed determination of Plaintiff's disability. In this case, the testimony of a medical expert was necessary to provide that informed basis. The ALJ called a medical expert that lacked expertise in the area of Plaintiff's impairment. Then, without the benefit of an expert medical opinion in the record, the ALJ improperly drew his own inferences and rendered his own opinions on questions involving Plaintiff's treatment, questions properly addressed by a medical expert. Additionally, the ALJ failed to address key evidence including the diagnoses of Plaintiff's treating physicians and his results on a pulmonary function test in denying Plaintiff's disability claim. Therefore the decision

of the ALJ is remanded in order for the record to be developed to include substantial evidence to support the ALJ's necessary findings regarding Plaintiff's disability claims.

So ordered.

_____
Virginia M. Kendall
United States District Judge
Northern District of Illinois

Date: March 24, 2006